IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY, LOUISVILLE DIVISION

| | | |
|---|---|---|
| PERCY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  16-CV-460 |
| v. | ) | |
| | ) | |
| LOUISVILLE JEFFERSON | ) | HON. DAVID J. HALE |
| COUNTY METRO GOVERNMENT, | ) | |
| Louisville Police Detectives | ) | MAG. REGINA S. EDWARDS |
| MICHAEL SMITHERS, KRISTEN | ) | |
| DOWNS,  BRIAN KURIGER, GARY | ) | |
| ALCORN, DAVID SANFORD, in | ) | |
| their individual capacities,  Louisville | ) | |
| Police Officer JEFFREY G. JEWELL, | ) | JURY TRIAL DEMANDED |
| in his individual capacity. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff, PERCY BROWN, by his attorneys LOEVY &

LOEVY, and complaining of Defendants LOUISVILLE JEFFERSON COUNTY

METRO GOVERNMENT, Louisville Police Detectives MICHAEL SMITHERS,

KRISTEN DOWNS, BRIAN KURIGER, GARY ALCORN, DAVID SANFORD, in

their individual capacities, University of Louisville Police Officer JEFFREY G.

JEWELL, in his individual capacity, and states as follows:

## Introduction

1.      Plaintiff Percy Brown lost seven years and three months of his life behind bars awaiting trial for crimes he did not commit.  This manifest injustice was not the result of mere flaws in the judicial system.

2.      Rather, the Defendants named herein conspired to take Brown's liberty through a series of knowingly false charges based on evidence that the Defendants themselves fabricated.

3.      Because it was fabricated, the evidence was entirely flimsy and Defendants never succeeded in obtaining a conviction.  Rather, to continue to deprive Mr. Brown of his freedom, they piled on one false charge after another, knowing that it would take the justice system years to unwind their lies.

4.      Although the system functioned in the sense that all of these charges were eventually dismissed, Defendants nevertheless succeeded in manipulating the system for nearly a decade.  As a result, Plaintiff was deprived of his liberty as a pretrial detainee just the same as if Defendants had secured a wrongful conviction.

5.      He now brings this case to enforce the Constitutional right to liberty guaranteed to all citizens by the United States Constitution.

## Jurisdiction and Venue

6.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

7.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## The Parties

9.      Plaintiff Percy Brown is a 52 year-old resident of Louisville, Kentucky.

10.     At all relevant times, Defendants Michael Smithers, Kristen Downs, Brian Kuriger, Gary Alcorn, and David Sanford were detectives with the City of Louisville Metro Police Department and employed by Defendant e Louisville Jefferson County Metro Government. These Defendants are sued in their individual capacities and were acting under the color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

11.     At all relevant times, Defendant Jeffrey G. Jewell was an officer employed by the University of Louisville Police Department . Defendant Jewell is sued in his individual capacity and was acting under the color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

12.     Defendants Smithers, Downs, Kuriger, Alcorn, Sanford, and Jewell, are referred to collectively as the "Defendants Officers."

13.      Defendant Louisville Jefferson County Metro Government ("Metro Government") formed on January 6, 2003, when the City of Louisville and Jefferson

County merged.  The Metro Government is a political subdivision of the Commonwealth of Kentucky and is a municipality of the first-class with home rule as enabled, defined, and empowered under KRS 67C.101.  It is the successor of the City of Louisville and Jefferson County, which were the municipal employers of every individual defendant named herein.  Since January 6, 2003, the Metro Government has been the employer of some or all of the individual defendants named herein.  Defendant Metro Government is responsible for the policies, practices, and customs of the Louisville Metro Police Department ("LMPD") and the former Louisville Division of Police ("LPD").

### The Murder of Jennifer French

14.     On September 16, 2004, Jennifer French resided at 2613 West Market Street with Rhonda Trice and Teri Pinotti.

15.     In the early morning hours of September 16, 2004, French was searching for drugs with an unknown male doctor.   Around 1:00 a.m., French called her preferred drug dealer, Cecil Gaines, to purchase crack cocaine. On that call, French informed Gaines that she needed drugs and that the doctor would pay Gaines for them. Shortly thereafter, Gaines arrived at 2613 West Market and provided French and the doctor with crack cocaine.  In exchange, the doctor pulled out a stack of hundred dollar bills and proceeded to pay Gaines.  After Gaines left, French and the doctor began smoking crack.

16.     At approximately 2:20 a.m., Gaines unexpectedly returned.  Trice opened the door and allowed Gaines inside.   Loveii "Dada" Burks entered the front

door after Gaines.   Upon entering, Burks ordered everyone to "get down" to the ground.  Burks then entered the bedroom of French.  Burks shot and killed French while the doctor successfully hid.

17.     Trice and her grandson fled from the house.  After taking her grandson to safety, Trice reentered and went into French's bedroom to steal drugs. After Trice entered the room, the doctor exited the closet and fled the home.  The doctor's identity remains unknown.

**The Defendants Knew Burks and Gaines Were the True Perpetrators**

18.     Henry Humphries was walking through an alley adjacent to the Ace Hardware Store located at 2610 Market Street at the time of the shooting.   After hearing gunfire, Humphries witnessed Loveil Burks flee the scene.  Burks ran past Humphries in the alley.

19.     At the beginning of the investigation, the Defendant Officers interviewed Humphries and Trice.  In those interviews, the Defendant Officers learned that Burks and Gaines were responsible for the murder of French.

20.     Henry Humphries viewed a photo line-up constructed by Detective Bowling and identified Loveil "Dada" Burks as the person who fled from the French murder.  An accurate depiction of that photo-array is enclosed below.



21.     Within days of French being killed, both Trice and Humphries informed the Defendant Officers that Burks was the shooter.  Trice also informed the Defendant Officers that she believed that Gaines was involved.  Although eyewitnesses immediately implicated Gaines and Burks in the murder, neither were interviewed by the Defendant Officers until months later.

22.      In spite of the overwhelming evidence against the true perpetrators, including two eyewitness identifications, the Defendant Officers never charged Gaines and Burks with the murder of Jennifer French.   In fact, the Defendant Officers stopped investigating the murder of French after obtaining these identifications.

23.     The Defendant Officers eventually classified the French murder as a cold case.

## The Framing of Percy Brown

24.     The Defendant Officers were never motivated to prove who actually killed French.

25.     Rather, they left the case unsolved and revived it only to use it as a threat against Mr. Brown.  In particular, the Defendant Officers suspected Mr. Brown of being involved in a check forgery scheme but could never prove it. Falsifying evidence against Mr. Brown in that case would risk injuring the case they had built against others involved in the scheme. Accordingly, they turned to fabricating unrelated charges against Brown.

26.     On December 3, 2004, less than six weeks after the French homicide, Montoya Tyson was arrested for attempting to cash a forged check.  Tyson was taken into custody and questioned by Defendants Smithers and Alcorn. During that interrogation, the Defendant Officers discovered that Tyson knew Mr. Brown and began their quest to frame him for crimes he did not commit.

27.     A week later, Defendants Smithers and Jewell interrogated Tyson.  In that interrogation, the Defendant Officers provided Tyson with facts relating to the French homicide and urged her to falsely implicate Mr. Brown.  Thereafter, the Defendant Officers coerced Tyson into implicating Mr. Brown in the murder of Jennifer French.

28.     Specifically, on December 10, 2004, Defendants Smithers and Jewell fabricated a false statement for Tyson that implicated Mr. Brown in the murder of Jennifer French and accused Mr. Brown of sodomizing Tyson.  Tyson was provided with consideration in exchange for making these false allegations against Mr. Brown in her fabricated December 10, 2004 statement.  Defendants Smithers and Jewell knew that Tyson's statements were false because they provided Tyson with all of the facts about the murder of Jennifer French and sodomy and because Tyson never indicated that she had any knowledge of either crime prior to her interrogation.

29.     In less than a week, these Defendant Officers had taken Tyson from being a suspect in a forgery scheme to a witness in a murder case who had been sexually assaulted by the Mr. Brown.

**Plaintiff Has an Ironclad Alibi for the Murder of Jennifer French**

30.     However, unknown to the Defendant Officers at the time, Mr. Brown has an impeccable alibi at the time French was killed.  Mr. Brown was gambling in a casino out of state.  The following receipt accurately illustrates Mr. Brown's whereabouts during the time in question.



**Defendants Threatened to Frame Mr. Brown**

31.    In December of 2004, Defendant Smithers contacted the Milwaukee
Police Department after obtaining Tyson's false statements against Mr. Brown.
Defendant Smithers falsely portrayed himself as an agent working for the United
States Secret Service during the phone conversation that ensued. In his
conversation with Milwaukee police, Defendant Smithers provided false information
regarding Mr. Brown.  Defendant Smithers' false representations regarding Mr.
Brown resulted in his arrest by Milwaukee Police Officers.

32.    On December 27, 2004, as a result of Defendant Smithers' call, Mr.
Brown was taken into custody by the Milwaukee Police Department for his alleged
involvement in a check-cashing scheme. Defendants Smithers and Sanford traveled
to Milwaukee, Wisconsin after Mr. Brown was taken into custody.  Detectives
Bowling and Sherrard accompanied them.

33.    Defendants Smithers, Sherrard, and Sanford subsequently

9

interrogated Mr. Brown in their attempt to obtain a confession regarding the check-cashing investigation.  Mr. Brown refused to cooperate and requested an attorney.

34.    Defendants Sanford and Smithers remained in the interrogation room after ignoring Mr. Brown's request for an attorney.  Defendant Smithers became enraged at Mr. Brown's refusal to cooperate and threatened Mr. Brown "Alright, you want to fuck with me, I'll hang the French murder on you," or words to that effect.  Defendant Sanford remained in the room while Smithers promised to frame Mr. Brown for crimes he did not commit.  Upon information and belief, Defendant Sanford did not inform any of his supervisors that a plan to frame Mr. Brown for various violent offenses had been agreed upon between himself and the other Defendants.

35.    Indeed, the Defendant Officers eventually made good on their threat to frame Mr. Brown.

## Fabricated False Statements Manufactured by Defendants Smithers and Jewell Are Used to Initiate Illegitimate Charges Against Plaintiff

36.    On January 6, 2005, Plaintiff was first indicted for two counts of sodomy.  These charges were based upon the fabricated December 10, 2004 statement from Montoya Tyson, which was manufactured by Defendants Smithers and Jewell.

37.    On January 6, 2005, Defendant Smithers testified to the substance of Montoya Tyson's false December statements before the grand jury.  At the time of his testimony, Defendant Smithers knew that the statement testified to before the

grand jury was false and fabricated by him and Defendant Jewell as part of their conspiracy to frame Plaintiff for crimes he did not commit.

38.     Ultimately, the grand jury issued an indictment against Plaintiff for two counts of Sodomy against Tyson on the basis of the evidence fabricated by Defendants Smithers and Jewell.

39.     Those charges were ultimately dismissed in a manner indicative of Plaintiff's innocence.

40.     The false and fabricated statements by Defendants Smithers and Jewell caused Plaintiff to be wrongfully incarcerated, and thus, contributed to the deprivation of his liberty.

### The Conspiracy to Frame Mr. Brown Widens

41.     Mr. Brown was charged with various forgery offenses in Wisconsin.

42.     After the dismissal of those charges, the Defendant Officers then proceeded to close the Jennifer French homicide investigation, which by now was considered to be a cold case, by framing Mr. Brown.

43.     By 2008, Defendant Downs was assigned to the French homicide investigation. Defendant Downs refused to investigate anyone other than Mr. Brown for the murder of Jennifer French.  For instance, Defendant Downs attempted to speak with Lovell Burks only on a single occasion and never spoke to Cecil Gaines.  Defendant Downs did not even initiate a single conversation with Henry Humphries– even though Humphries identified Burks as the individual who killed Jennifer French.

11

44.     Instead of conducting a legitimate investigation, Defendant Downs sought to make good on the Defendants Smithers and Sanford's prior threats to frame Mr. Brown.

45.     Defendant Downs teamed up with the other Defendant Officers to leverage witnesses into falsely implicating Mr. Brown of murder and other violent offenses.

46.     In hindsight, the Defendant Officers' plan was entirely transparent. The Defendant Officers conspired to frame Mr. Brown for the murder of Jennifer French and other violent offenses by offering significant consideration to suspects in the forgery investigation in exchange for their false statements.  The Defendant Officers carried out this plan over the course of more than seven years by manufacturing witnesses and fabricating evidence in an effort to keep Mr. Brown incarcerated.

47.     For example, Defendants Downs and Smithers approached Andrea Foster and offered to dismiss her check-cashing case if she falsely accused Mr. Brown of sexual assault.  The Defendant Officers offered the same deal to Nina Snow, Montoya Tyson, Jennifer Renfro, Michelle Connely, and Talesha Lynch, who were all suspects in the check-cashing scheme.

48.     At the time Defendants Downs and Smithers approached her, Foster was a suspect in the forgery case being investigated by Defendant Smithers. Defendants Downs and Smithers spent nearly an hourly threatening Foster into falsely implicating Mr. Brown.  Foster repeatedly informed Defendants Downs and

12

Smithers that Mr. Brown never sexually assaulted her - but Defendants Downs and Smithers did not care.  They continued insisting that Foster falsely accuse Mr. Brown in exchange for promises of leniency.  The Defendants illegal actions with regard to Ms. Foster illustrate their desire to frame Mr. Brown for crimes he did not commit.

49.     Montoya Tyson was also propositioned by the Defendant Officers and reluctantly accepted their bait.  Tyson received significant consideration in exchange for falsely accusing Mr. Brown of sodomy and murder.

50.     On March 8, 2007, Tyson received three years of probation for her role in the check-cashing scheme.

51.     The receipt of probation was consistent with the promises made to her by the Defendant Officers when they procured Tyson's false statements.

52.     The Defendant Officers then leveraged Tyson's probation to manufacture additional false allegations against Mr. Brown.   On December 9, 2008, Tyson reported to her probation officer and was notified that she violated several conditions of her probation.

53.     Defendants Kuriger and Downs then informed Tyson that she would be arrested for the violations unless she falsely implicated Mr. Brown again. Specifically, Defendants Kuriger and Downs instructed Tyson to claim that she was an eyewitness to the French homicide and that she witnessed Mr. Brown commit the murder.

54.     On December 9, 2008, Defendants Kuriger and Downs fabricated a

false statement for Tyson that implicated Mr. Brown in the murder of Jennifer French.  That false statement further implicated Mr. Brown of rape and intimidation.

55.     Additionally, on December 9, 2008, Defendant Kuriger met with Michelle Connely.  On that date, Defendant Kuriger fabricated a statement for Ms. Connely and instructed her to falsely state that Mr. Brown threatened to kill her if she testified against him in a murder.

56.     Further, according to the false and fabricated statement, Ms. Connely alleged that Mr. Brown also requested that she assist him in killing Ms. French.

### The Wrongful Initiation of Charges Against Mr. Brown for Murder, Sodomy, and Witness Intimidation Continued in 2009

57.      On December 15, 2008, less than a week after Tyson's coerced, false, and manufactured statement, Mr. Brown was arrested for the murder of Jennifer French.

58.     On December 16, 2008, Defendant Downs testified to the substance of the previously obtained false statements from Tyson and Connely knowing that she and Defendants Kuriger, Jewell, and Smithers previously fabricated them.

59.     Defendant Downs also knew at the time of her testimony that Defendants Smithers and Jewell had previously fabricated statements for Ms. Tyson that falsely implicated Plaintiff in the murder and a host of other crimes.

60.     Nonetheless, Defendant Downs did not inform the grand jury of the

Defendants' misconduct. Instead, she misled the jurors into believing that Ms. Tyson's statements were truthful, knowing that they were actually false and fabricated by herself and the other Defendants.

61.     Based on this false and fabricated evidence, on December 16, 2008, Plaintiff was indicted for murder, sodomy (against Montoya Tyson), and intimidating participants in the legal process (Montoya Tyson and Michelle Connely).

62.      This evidence, which Defendants Downs, Kuriger, Jewell, and Smithers knew to be false, was the only evidence of criminality offered at the grand-jury hearing that tied Mr. Brown to the charges for which he was indicted: murder, sodomy, and intimidation of participants in the legal process.

63.     The false and fabricated statements by Defendants Kuriger, Downs, Smithers and Jewell caused Plaintiff to be wrongfully incarcerated, and thus, contributed to the deprivation of his liberty.

64.     Those charges were ultimately dismissed in a manner indicative of Plaintiff's innocence.

### The Wrongful Initiation of Charges Against Mr. Brown for Murder, Kidnapping, Sodomy, and Witness Intimidation Continued in 2009

65.     On December 31, 2008, Defendant Downs fabricated a false statement for Jennifer Renfro that implicated Mr. Brown in a number of crimes.  In that manufactured statement, Ms. Renfro falsely claimed that Mr. Brown kidnapped and sodomized her before intimidating her against testifying against him.

66.     At the time she manufactured this statement, Defendant Downs knew

that the allegations were false.

67.     In February of 2009, Plaintiff was indicted for murder, kidnapping (Jennifer Renfro), sodomy (Jennifer Renfro and Montoya Tyson), and intimidating participants in the legal process (Montoya Tyson, Michelle Connely, and Jennifer Renfro).

68.     Again, the basis of this indictment was Defendant Downs' testimony regarding the fabricated statements of Montoya Tyson, Jennifer Renfro, and Michelle Connely. Defendant Downs knew these statements were false and fabricated and nonetheless, presented the substance of them to the grand jury.

69.     Even so, Defendant Downs did not inform the grand-jury of Defendants' misconduct and instead misled the jurors into believing that the statements were truthful, knowing instead, that they were actually false and fabricated by herself and Defendants Kuriger, Smithers, and Jewell.

70.     The false and fabricated statements by Defendants Kuriger, Downs, Smithers and Jewell caused Plaintiff to be wrongfully incarcerated, and thus, contributed to the deprivation of his liberty.

71.     Those charges were ultimately dismissed in a manner indicative of Plaintiff's innocence.

### Defendant Downs Fabricates a Statement for Nina Snow and Initiates Additional Charges Against Plaintiff

72.     On December 17, 2009, Defendant Downs also manufactured a false

16

statement for Nina Snow that implicated Mr. Brown in a series of crimes.  This fabricated statement falsely implicated Mr. Brown of sodomy, assault, and wanton endangerment of Ms. Snow.

74.     As a result of the false and fabricated statement manufactured by Defendant Downs, on January 26, 2010, Plaintiff was indicted for sodomy, assault, and wanton endangerment against Nina Snow.

75.     Defendant Downs knew this statement was false and fabricated. Nonetheless, she presented the substance of it to the grand jury.

76.     Defendant Downs did not inform the grand jury of her misconduct. Instead, she misled the jurors into believing that Ms. Snow's statement was truthful, knowing that she fabricated the false statement herself.

77.     The false and fabricated statement by Defendant Downs caused Plaintiff to be wrongfully incarcerated, and thus, contributed to the deprivation of his liberty.

78.     The charges stemming from this fabricated statement were ultimately dismissed in a manner indicative of Plaintiff's innocence.

### The Wrongful Initiation of Charges Against Mr. Brown for Murder, Kidnapping, Sodomy, and Witness Intimidation Continued in 2014

79.     On May 16, 2014, Defendant Downs fabricated another statement which was used to initiate charges against Mr. Brown.  This time, Defendant Downs recruited an incarcerated inmate to levy charges against Mr. Brown.

80.     In this way, Defendant Downs manufactured a false statement for

Talisha Lynch that implicated Mr. Brown in a number of crimes, including rape and sodomy.

81.     On May 29, 2014, Plaintiff was indicted for rape and sodomy of Talesha Lynch.

82.     The basis for this indictment was Defendant Downs' testimony regarding her May 16, 2014 fabricated statement for Talesha Lynch.  Defendant Downs knew this statement was false and fabricated and nonetheless, presented the substance of it to the grand jury.

83.     Defendant Downs did not inform the grand-jury of her misconduct. She, instead misled the jurors into believing that Ms. Lynch's statement was truthful, knowing that it was actually false and fabricated by herself.

84.     The false and fabricated statement by Defendant Downs caused Plaintiff to be wrongfully incarcerated, and thus, contributed to the deprivation of his liberty.

85.     The charges stemming from this fabricated statement were ultimately dismissed in a manner indicative of Plaintiff's innocence.

**The Wrongful Initiation of Charges Against Mr. Brown for Kidnapping, Sodomy, Rape, and Witness Intimidation Continued in 2015**

86.     On February 23, 2015, Plaintiff was again indicted on nearly every charge contained in his February 2009 indictment.  Additionally, the indictment contained the charges lodged against him in the two intervening indictments: (1) sodomy charges relating to Montoya Tyson, Nina Snow, Talesha Lynch, and Jennifer Renfro; and, (2) kidnapping Ms. Renfro, raping Ms. Lynch, assaulting Ms. Snow, wantonly endangering

Ms. Snow and Ms. Renfro, and intimidating Ms. Tyson – a witness who implicated Plaintiff in a murder, rape, sodomy, and a host of other charges – into not testifying against him regarding a number of charges, including the murder.

87.    The basis for this indictment was Defendant Downs' testimony regarding the fabricated statements from Montoya Tyson, Talisha Lynch, Nina Snow, and Jennifer Renfro.

88.    Defendant Downs knew these statements were false and fabricated and nonetheless presented the substance of it to the grand jury.  Defendant Downs did not inform the grand jury of her own misconduct, nor that of the other Defendants.  Instead, she misled the jurors into believing that these false and fabricated statements were truthful, knowing that they were actually false and fabricated.

89.    The false and fabricated statements caused Plaintiff to be wrongfully incarcerated, and thus, contributed to the deprivation of his liberty.

90.    On April 5, 2016, the criminal proceeding was dismissed in a manner indicative of his innocence.

### Summary of the Defendants' Conspiracy to Frame Mr. Brown For a Series of Crimes He Did Not Commit

91.    The Defendants framed Mr. Brown for a series of crimes – including but not limited to murder, rape, sodomy, witness intimidation, and kidnapping – that he did not commit.

92.    The Defendants conspired to frame Mr. Brown through the use of fabricated statements to initiate false charges.  These false charges formed the basis of a single criminal proceeding.

93.     This criminal proceeding spanned nearly a decade and was not resolved until April 5, 2016.

94.     The Defendant Officers knew that the witness statements used to initiate the charges against Mr. Brown were false and the product of improper coercion.  Even still, the Defendant Officers used these statements to falsely initiate charges against Mr. Brown.

95.      In their conspiracy to frame Plaintiff, sometimes acting alone and sometimes acting in concert, the Defendant Officers manipulated and manufactured a number of witnesses including Nina Snow, Montoya Tyson, Jennifer Renfro, Michelle Connely, and Talesha Lynch.

96.     The Defendant Officers threatened and coached these witnesses and others, and induced individuals who otherwise had no knowledge to be false witnesses, resulting in several witnesses making false statements about Mr. Brown and falsely implicating him in the murder of French and various other violent crimes.  The Defendant Officers knew that these statements were false and intended that they be so.

97.     Prior to the dismissal of charges against Mr. Brown, the Defendant Officers actively concealed the falsity of the evidence they fabricated, the methods by which they fabricated the evidence, and the scope of their fabrication.

98.      As a result of the Defendant Officers continued fabrication of evidence, continued withholding of material exculpatory evidence, and continued

20

manipulation of witnesses, Mr. Brown was subject to continued prosecution on murder charges and other violent crimes.

99.     Sometimes acting alone, and sometimes acting in concert, the Defendant Officers, over the course of more than seven years, also manipulated physical evidence, manufactured false inculpatory evidence, and lost or destroyed material exculpatory evidence.

100.    The evidence that was fabricated, falsified, and manufactured by the Defendant Officers was the only evidence linking Mr. Brown to the murder and violent crimes that he was charged with and was the only basis upon which prosecutors filed and maintained charges against him.

101.    Sometimes acting alone and sometimes acting in concert, the Defendant Officers, over the course of seven years, concealed from prosecutors, Mr. Brown, and Mr. Brown's defense counsel both the falsity of the witness statements and the unlawful methods by which they procured and fabricated this evidence.

102.    Sometimes acting alone and sometimes acting in concert, the Defendant Officers, over the course of more than seven years, withheld, concealed, or destroyed material exculpatory evidence, keeping that evidence from prosecutors, the court, Mr. Brown, and Mr. Brown's defense counsel.

103.     The Defendant Officers actively misled prosecutors, who relied on the false evidence fabricated by the Defendant Officers, to continue to pursue Mr. Brown's prosecution.

**Mr. Brown's Vindication**

104.     For nearly a decade, the Defendant Officers contrived to frame Mr. Brown for the murder of Jennifer French and several other violent crimes and to deprive him of his freedom without due process of law.

105.     Ultimately the murder, rape, kidnapping, sodomy, assault, wanton endangerment, and witness intimidation charges against Mr. Brown were dismissed.

106.     The criminal proceeding was ultimately terminated in a manner indicative of Plaintiff's innocence on April 5, 2016.

107.     On that date, after spending nearly eight years incarcerated in the Jefferson County Jail, Mr. Brown was finally released into the loving arms of his close family and friends.

**Defendants' Pattern and Practice of Misconduct
In Order to Secure Wrongful Prosecutions and Convictions**

108.     The Defendant Officers' misconduct in this case was not an isolated occurrence.

109.      Rather, the Louisville Jefferson County Metro Government , by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by LDP and LMPD officers, including but not limited to:

a.     conducting impermissibly suggestive witness identification procedures;

b.     fabricating evidence;

22

c.      coercing witnesses into providing false statements;

d.      failing to promptly document and disclose material, exculpatory and impeachment evidence to prosecutors;

e.      failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations; and/or

f.      engaging in the ongoing affirmative concealment and cover-up of police misconduct.

110.    The municipal defendants, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline LDP and LMPD officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to:

g.      conducting witness identification procedures;

h.      maintaining physical evidence and accurately documenting investigative work;

i.      documenting and promptly disclosing exculpatory and impeachment evidence to prosecutors; and/or

j.      conducting constitutionally adequate investigations with objectivity rather than tunnel vision.

111.    As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the LDP and the LMPD.  In accordance with this code, police detectives refused to report and

otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

112.    As a result of the municipal defendants' established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the LDP, certain LDP police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.  As a result of these policies and practices of the municipal defendants, members of the LDP and LMPD act with impunity when they violate the constitutional and civil rights of citizens.

113.    As an example, in 1993, pursuant to these unconstitutional customs and practices, LDP officers wrongly arrested, maliciously prosecuted and covered up or withheld exculpatory and impeachment information from another innocent suspect, Edwin Chandler, who was wrongfully convicted of a murder he did not commit.  Mr. Chandler suffered nine years in prison and six years on parole before he was finally exonerated.  Mr. Chandler filed a civil rights lawsuit alleging many of the same types of misconduct that arose during Mr. Brown's wrongful arrest and malicious prosecution.

114.    One year earlier, in 1992, and pursuant to these same unconstitutional customs and practices, LDP officers wrongly arrested, malicious prosecuted, and covered up or withheld exculpatory and impeachment information from William Gregory, another innocent suspect, who was wrongfully convicted of two rapes for which he was entirely innocent.  Mr. Gregory spent more than seven years in prison before he was exonerated by DNA evidence.  Mr. Gregory also filed a civil rights lawsuit alleging many of the same types of misconduct that arose during Mr. Brown's wrongful arrest and malicious prosecution.

115.    In 1996, pursuant to these unconstitutional customs and practices, LPD officers – including several named as defendants in this lawsuit - wrongly arrested, malicious prosecuted, and covered up or withheld exculpatory and impeachment information from Kerry Porter, who was wrongfully convicted of a murder for which he was entirely innocent.  Mr. Porter spent more than fourteen years in prison before he was exonerated by DNA evidence.  Mr. Porter also filed a civil rights lawsuit alleging many of the same types of misconduct that arose during Mr. Brown's wrongful arrest and malicious prosecution.

116.    The municipal defendants' failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case.  Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the municipal defendants' practices and *de facto* policies, as alleged above.

117.    The municipal defendants and officials within the LDP and LMPD failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Brown's ongoing injuries.

118.    The policies and practices described in the foregoing paragraphs were consciously approved by the municipal defendants' policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Damages

119.    Percy Brown spent more than eight years incarcerated for crimes he did not commit.  He must now attempt to make a life for himself without the benefit of nearly a decade of life experiences, which normally equip adults for that task.

120.    Additionally, the emotional pain and suffering caused by losing those years has been substantial.  During his incarceration, he was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  Mr. Brown missed out on the ability to share holidays, births, funerals, and other life events with loved ones, to raise his five children, the opportunity to fall in love, to marry, and the fundamental freedom to live one's life as an autonomous human being.

121.    As a result of the foregoing, Mr. Brown has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

## Count I – 42 U.S.C. § 1983
## Malicious Prosecution

122.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

123.     As described more fully above, all of the Defendant Officers, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Brown of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

124.     In the manner described more fully above, the Defendant Officers made, influenced and/or participated in the decision to prosecute Mr. Brown for rape, sodomy, kidnapping, witness intimidation, wanton endangerment, and assault, for which prosecution there was no probable cause and which caused Mr. Brown to suffer a deprivation of liberty.  Their misconduct included falsifying evidence and withholding exculpatory and impeachment evidence.

125.     As described more fully above, the prosecution was resolved in Mr. Brown's favor.

126.     The Defendant Officers' misconduct directly resulted in the unlawful prosecution and continued deprivation of Mr. Brown's liberty in violation of his constitutional rights.

127.     As a result of this violation of his constitutional rights, Mr. Brown suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

27

128.    The Defendant Officers' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Brown's constitutional rights.

129.    The misconduct described in this Count was undertaken pursuant to a routine practice of the LMPD to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Mr. Brown's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

130.    These widespread practices, so well-settled so as to constitute *de facto* policy in the LMPD, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

131.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count II – 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments Fabrication of False Evidence

132.    Each paragraph of this Complaint is incorporated as if restated fully herein.

133.    In the manner described more fully above, the Defendant Officers, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements attributed

28

to witnesses, and fabricated testimony offered at grand jury and other pretrial proceedings.  The Defendant Officers knowingly fabricated this evidence and a reasonable likelihood exists that the false evidence affected the decision of the grand jurors and courts that considered this false evidence when determining whether probable cause existed.

134.    The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

135.    The Defendant Officers' misconduct directly resulted in the unjust continued incarceration of Plaintiff, thereby denying him from his constitutional right to due process as guaranteed by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.

136.    As a direct and proximate result of the Defendant Officers' actions, Plaintiff's constitutional rights were violated and he suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count III - 42 U.S.C. § 1983
### Failure to Intervene

137.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

138.   In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

139.   As a result of the Defendant Officers failure to intervene to prevent the violation of Mr. Brown's constitutional rights, Mr. Brown suffered pain and injury, as well as emotional distress.

140.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Brown's rights.

141.   The misconduct described in this Count was undertaken pursuant to the policy and practice of the LMDP in the manner described more fully in preceding paragraphs 107-110, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

**Count IV**
**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

142.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

143.   After Ms. French was murdered, the Defendant Officers reached an agreement amongst themselves to frame Mr. Brown for the crimes, and to thereby deprive Mr. Brown of his constitutional rights and his liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

144.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

145.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

146.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Brown's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

147.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

148.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the LMDP in the manner described more fully in preceding paragraphs 107-110, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count V - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Louisville Jefferson County Metro Government

149.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

150.    The actions of LMPD officers in withholding material exculpatory information from Mr. Brown and his counsel were undertaken pursuant to the policies and practices of the LMPD, described above, which were ratified by

policymakers for the Louisville Jefferson County Metro Government with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers on the requirements concerning the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

151.    The policies and practices described in this Count were maintained and implemented by the Louisville Jefferson County Metro Government with deliberate indifference to Plaintiff's constitutional rights.

152.    As a direct and proximate result of the Metro Government's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.  The Louisville Jefferson County Metro Government is therefore liable for the misconduct

WHEREFORE, Plaintiff, PERCY BROWN, respectfully requests that this Court enter judgment in his favor and against Defendants LOUISVILLE JEFFERSON COUNTY METRO GOVERNMENT, Louisville Police Detectives MICHAEL SMITHERS, KRISTEN DOWNS, BRIAN KURIGAN, GARY ALCORN, DAVID SANFORD, in their individual capacities,, and University of Louisville Police Officer JEFFREY G. JEWELL, in his individual capacity, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, PERCY BROWN, hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,


/s/ Elliot Slosar
*One of Plaintiff's Attorneys*


Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902

## <u>CERTIFICATE OF SERVICE</u>

I, Elliot Slosar, an attorney, hereby certify that on October 4, 2018, I filed the foregoing First Amended Complaint via the Court's CM/ECF System and thereby served a copy on all counsel of record.

<u>/s/ Elliot Slosar</u>

34